No. 25-2566

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

**WYATT BURY, LLC**, *et al.*,

Plaintiffs-Appellants,

v.

**CITY OF KANSAS CITY, MISSOURI**, *et al.*,

Defendants-Appellees.

On Appeal from the United States District Court
for the Western District of Missouri at Kansas City, Honorable
Roseann A. Ketchmark, No. 4:25-cv-84

**BRIEF OF *AMICI CURIAE*, THE TREVOR PROJECT, INC.
AND THE NATIONAL ALLIANCE FOR MENTAL ILLNESS,
IN SUPPORT OF DEFENDANTS-APPELLEES AND
AFFIRMANCE**

Abbey Hudson
*Counsel of Record*
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000
ahudson@gibsondunn.com

Alexander Fischer
GIBSON, DUNN & CRUTCHER LLP
811 Main St., Ste. 3000
Houston, TX 77002

Kelly Herbert
Apratim Vidyarthi
Cate Nash
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166

Julia Doody
GIBSON, DUNN & CRUTCHER LLP
1900 Lawrence St., Suite 300
Denver, CO 80202

*Attorneys for Amici Curiae The Trevor Project, Inc. and the National
Alliance on Mental Illness*
[additional counsel listed on inside cover]

Quinn Ferrar
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center #2600
San Francisco, CA 94111

Erica Robison
GIBSON, DUNN & CRUTCHER LLP
310 University Avenue
Palo Alto, CA 94301

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici curiae* The Trevor Project, Inc. and the National Alliance on Mental Illness ("NAMI") state that they are non-profit, tax-exempt organizations. The Trevor Project is incorporated in California, with no parent corporation, and no publicly held corporation has 10% or greater ownership in it. NAMI is incorporated in Virginia, with no parent corporation, and no publicly held corporation has 10% or greater ownership in it.

i

Appellate Case: 25-2566    Page: 3    Date Filed: 02/12/2026 Entry ID: 5607768

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST ................................................................... 1

SUMMARY OF THE ARGUMENT ....................................................... 2

ARGUMENT ......................................................................................... 5

I. The Trevor Project's Data and Experience Confirm That Conversion Therapy Posing as Professional Care Is Dangerous and Significantly Harms LGBTQ Youth. ....... 5

    A. The Trevor Project's Crisis and Suicide-Prevention Service Data Reveal the Harmful Impact of Conversion Therapy ..................................... 7

    B. The Trevor Project's National Surveys and Peer-Reviewed Research Reveal Conversion Therapy as a Critical Driver of Elevated Anxiety, Depression, and Suicidality Among LGBTQ Youth. ............................................................. 10

    C. The Trevor Project's Data is Consistent with Decades of Research on the Harms of Conversion Therapy. .................................................... 16

    D. The Trevor Project's Surveys Demonstrate That Fear of Conversion Therapy Prevents Many LGBTQ Youth from Seeking Help. ........................... 19

II. The City and County Considered and Balanced Competing Positions on Conversion Therapy, and the Court Should Defer to Their Findings. ............................... 21

III. The Ordinances Fall Squarely Within a Local Government's Traditional Authority to Protect Minors by Regulating Medical Treatments and Standards of Care for Licensed Professionals. .......................................... 29

CONCLUSION .................................................................................. 35

ii

Appellate Case: 25-2566    Page: 4    Date Filed: 02/12/2026 Entry ID: 5607768

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bibb v. Navajo Freight Lines*,
359 U.S. 520 (1959).............................................................30

*Brandt v. Griffin*,
147 F.4th 867 (8th Cir. 2025)..................................... 24, 32

*Collins v. Texas*,
223 U.S. 288 (1912).............................................................29

*Euclid v. Ambler Realty Co.*,
272 U.S. 365 (1926).............................................................31

*FCC v. Beach Commc'ns, Inc.*,
508 U.S. 307 (1993).............................................................23

*Fla. Bar v. Went for It Inc.*,
515 U.S. 618 (1995).............................................................33

*Ginsberg v. New York*,
390 U.S. 629 (1968).............................................................34

*Goldblatt v. Hempstead*,
369 U.S. 590 (1962).............................................................30

*Goldfarb v. Va. State Bar*,
421 U.S. 773 (1975).............................................................29

*Gonzales v. Carhart*,
550 U.S. 124 (2007).............................................................24

*Hadacheck v. Sebastian*,
239 U.S. 394 (1915).............................................................31

*Lambert v. Yellowley*,
272 U.S. 581 (1926).............................................................29

iii

Appellate Case: 25-2566    Page: 5    Date Filed: 02/12/2026 Entry ID: 5607768

*Lehon v. Atlanta*,
242 U.S. 53 (1916)................................................................30

*Marrs v. Oxford*,
32 F.2d 134 (8th Cir. 1929)...............................................31

*Masterpiece Cakeshop v. Colo. Civil Rights Comm'n*,
584 U.S. 617 (2018)...........................................................34

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
559 U.S. 229 (2010)......................................................32, 34

*National Ass'n for Advancement of Psychoanalysis v. Cal.*
*Bd. of Psychology*,
228 F.3d 1043 (9th Cir. 2000).......................................34, 35

*National Inst. of Family & Life Advocates v. Becerra*,
585 U.S. 755 (2018)...........................................................33

*New York v. Ferber*,
458 U.S. 747 (1982)...........................................................33

*Ohralik v. Ohio State Bar Ass'n*,
436 U.S. 447 (1978)...............................................29, 32, 33

*Osborne v. Ohio*,
495 U.S. 103 (1990)...........................................................34

*Personnel Administrator of Massachusetts v. Feeney*,
442 U.S. 256 (1979)..............................................................4

*Powell v. Texas*,
392 U.S. 514 (1968)...........................................................35

*Reinman v. Little Rock*,
237 U.S. 171 (1915)...........................................................30

*Thomas Cusak Co. v. Chicago*,
242 U.S. 526 (1917)...........................................................31

iv

Appellate Case: 25-2566    Page: 6    Date Filed: 02/12/2026 Entry ID: 5607768

*Tingley v. Ferguson,*
  47 F.4th 1055 (9th Cir. 2022) .......................................................... 3

*Turner Broad. Sys., Inc. v. FCC,*
  520 U.S. 180 (1997) ........................................................................ 24

*United States v. Rutherford,*
  442 U.S. 544 (1979) .......................................................................... 5

*United States v. Skrmetti,*
  605 U.S. 495 (2025) .............................................................. 4, 24, 30

*Upper Midwest Booksellers Ass'n v. Minneapolis,*
  780 F.2d 1389 (8th Cir. 1985) ...................................................... 33

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council,*
  425 U.S. 748 (1976) ........................................................................ 33

*Wyatt Bury, LLC v. City of Kansas City,*
  804 F. Supp. 3d 939 (W.D. Mo. 2025) .......................................... 23

## Statutes

Jackson Cnty. Ord. 5371 (Apr. 3, 2023) .......................................... 28

Jackson Cnty. Ord. 5575 .................................... 2, 18, 20, 28,30

K.C. Ord. §50-234 ............................................ 18, 21, 29, 30

## Other Authorities

AFSP, *LGBTQ Individuals & Populations* (2025),
  http://bit.ly/4mnnGMK ................................................................. 17

AFSP, *Policy Priority: LGBTQ Individuals & Communities*
  3–5 (2024), http://bit.ly/4mwG7i0 .......................................... 17, 19

Allison Kite, *Kansas City bans conversion therapy for
  LGBTQ minors, the 2nd Missouri city to do so*, Kansas
  City Star (Nov. 14, 2019) ............................................................... 22

Appellate Case: 25-2566    Page: 7    Date Filed: 02/12/2026 Entry ID: 5607768

Am. Acad. of Nursing, *American Academy of Nursing Position Statement on Reparative Therapy*, 63 Nursing Outlook 368, (2015), *available at* http://bit.ly/4mvOPNK ................. 19

Am. Ass'n of Suicidology, *Suicidal Behavior Among Lesbian, Gay, Bisexual, and Transgender Youth Fact Sheet* 1 (2019), http://bit.ly/47bgv5B ............................................................. 16

Am. Med. Ass'n, *Health Care Needs of Lesbian, Gay, Bisexual, Transgender and Queer Populations H-160.991* §1(c), http://bit.ly/4n0l2N1 ............................................................ 19

Am. Med. Ass'n, *Sexual orientation and gender identity change efforts (so-called "conversion therapy")* 3 (2022), http://bit.ly/3Vdw6dw ..................................................................... 18

Am. Psychol. Ass'n, *Just the Facts About Sexual Orientation and Youth* 6 (2008), http://bit.ly/4fTlIBx; ........................................... 19

Am. Psychol. Ass'n, *Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation* 4 (2009), http://bit.ly/45HE4AE ...................................................................... 19

Amy E. Green et al., *Self-Reported Conversion Efforts and Suicidality Among US LGBTQ Youths and Young Adults, 2018* Am. J. Pub. Health 1221 (2020)............................................... 14

Amy Przeworski et al., *A systematic review of the efficacy, harmful effects, and ethical issues related to sexual orientation change efforts*, Clinical Psychol.: Sci. & Prac. 1 (2020), http://bit.ly/4mQgKYk ...................................................... 16, 18

Chris Noone et al., *Critically Appraising the Cass Report: Methodological Flaws and Unsupported Claims*, 25 BMC Medical Research Methodology, 128 (2025)....................................... 28

Appellate Case: 25-2566    Page: 8    Date Filed: 02/12/2026 Entry ID: 5607768

D. Paul Sullins, *Absence of behavioral harm following non-efficacious sexual orientation change efforts: A retrospective study of United States sexual minority adults, 2016–2018*, 13 Frontiers in Psych. 823647 (2022)...................................................26

D. Paul Sullins et al., *Efficacy and risk of sexual orientation change efforts: A retrospective analysis of 125 exposed men* (2021), http://bit.ly/4p73D7h ...........................................27

D. Paul Sullins*, Sexual Orientation Change Efforts Do Not Increase Suicide: Correcting a False Research Narrative* Archives of Sexual Behavior 3377 (Sept. 2022) ................................26

Hilary Cass, *Independent Review of Gender Identity Services for Children and Young People*, NHS 150 (Apr. 2024), http://bit.ly/3HMyrZR ...................................................28

Ilan H. Meyer & John R. Blosnich, *Commentary: Absence of Behavioral Harm Following Non-Efficacious Sexual Orientation Change Efforts: A Retrospective Study of United States Sexual Minority Adults, 2016-2018* Frontiers in Psych. 997513 (2022)..............................26, 27

JacksonCountyMO, *Jackson County Diversity Equity & Inclusion Committee Public Hearing March 16, 2023* (YouTube, Mar. 21, 2023), https://bit.ly/4afpYIQ ...........................22

John R. Blosnich et al., *Correcting a False Research Narrative: A Commentary on Sullins*, 52 Archives of Sexual Behavior 885 (2023)...........................................26

Lisa M. Diamond & Clifford J. Rosky, *Scrutinizing Immutability: Research on Sexual Orientation & U.S. Legal Advocacy for Sexual Minorities* J. of Sex Research 363 (2016)..............................................27, 28

NAMI, *Conversion Therapy: Where We Stand* (2020), http://bit.ly/4oOAgX5 .........................................18

Appellate Case: 25-2566   Page: 9   Date Filed: 02/12/2026 Entry ID: 5607768

Public Hearing regarding Ordinance #5711 (Mar. 6, 2023), https://bit.ly/4a76Pc9 ............................................................. 22

Rhitu Chatterjee, *Trump administration ends 988 Lifeline's special service for LGBTQ+ young people,* NPR (July 19, 2025), https://bit.ly/4r6ypxr ..................................................... 6

Statista Rsch. Dep't, *U.S. LGBTQ youth who experienced conversion therapy and attempted suicide 2023*, Statista (July 2, 2024), http://bit.ly/4fQZIam ...................................... 16

Substance Abuse & Mental Health Servs. Admin. ("SAMHSA"), *Moving Beyond Change Efforts: Evidence and Action to Support and Affirm LGBTQI+ Youth* (2023), http://bit.ly/476F5Vj ..................................................... 17

Travis Campbell & Yana van der Meulen Rodgers, *Conversion therapy, suicidality, and running away: An analysis of transgender youth in the U.S.*, 89 J. Health Econ. 1 (2023), http://bit.ly/4oL3Lcl .............................. 17

Trevor Project, *2022 National Survey on LGBTQ Youth Mental Health* (May 2022), http://bit.ly/4n0Dyow ........................... 13

Trevor Project, *2023 U.S. National Survey on the Mental Health of LGBTQ Young People* 3 (May 2023), http://bit.ly/41UmkAT .................................................. 20, 21

Trevor Project, *2024 U.S. National Survey on the Mental Health of LGBTQ+ Young People* (May 2024), http://bit.ly/45S0b7C ................................................ 11, 12, 20

Trevor Project, *Learn With Love: Episode 1*, YouTube (Jan. 31, 2023), http://bit.ly/4mzIn8k ....................................... 10

Trevor Project, National Survey on LGBTQ Youth Mental Health (June 2019), http://bit.ly/41jbpAD ........................... 14

Trevor Project, *National Survey on LGBTQ Youth Mental Health 2020* (2020), http://bit.ly/4fQ3FvZ ........................... 14

Appellate Case: 25-2566    Page: 10    Date Filed: 02/12/2026 Entry ID: 5607768

Trevor Project, *National Survey on LGBTQ Youth Mental Health 2021* (2021), http://bit.ly/4657JoA; ......................................... 14

Trevor Project, *Project SPARK Interim Report: A Longitudinal Study of Protective and Risk Factors in LGBTQ+ Youth Mental Health (2023-2025)* (Oct. 16, 2025), https://bit.ly/49PVRYv ....................................................... 15

Trevor Project, *TrevorSpace*, http://bit.ly/4lHtNuk ................................. 6

Trevor Project, *We're here for you*, bit.ly/4oOAvBr ................................. 6

U.S. Joint Statement, *United States Joint Statement Against Conversion Efforts* (2023), http://bit.ly/45zmTm8; ............................ 19

## Rules

Fed. R. App. P. 29(a)(4)(E) ....................................................................... 2

ix

Appellate Case: 25-2566    Page: 11    Date Filed: 02/12/2026 Entry ID: 5607768

## STATEMENT OF INTEREST

The Trevor Project, Inc. and NAMI submit this brief to summarize the overwhelming evidence linking conversion therapy to a significantly heightened risk of suicidality and other serious harms to youth. *Amici* advocate to end conversion therapy through democratic processes.

The Trevor Project is the nation's leading crisis-intervention and suicide-prevention organization dedicated to serving lesbian, gay, bisexual, transgender, queer, and questioning ("LGBTQ") youth. It offers the only nationwide accredited, free, and confidential phone, instant-message, and text-messaging crisis-intervention services, which tens of thousands of LGBTQ youth use monthly. By analyzing and evaluating aggregate data and individual narratives obtained through these services and the organization's national surveys, it produces innovative research with clinical implications for issues affecting LGBTQ youth. The Trevor Project works firsthand with LGBTQ youth who have been subjected to conversion therapy.

NAMI is the nation's largest grassroots mental-health organization dedicated to building better lives for millions of Americans affected by mental illness. NAMI provides advocacy, education, support, and public

- 1 -

Appellate Case: 25-2566    Page: 12    Date Filed: 02/12/2026 Entry ID: 5607768

awareness so individuals and families affected by mental illness can build better lives.  NAMI envisions a world where all people affected by mental illness, including LGBTQ people, live healthy, fulfilling lives supported by a community that cares.[1]

*Amici* have obtained consent to file this brief from both parties pursuant to Federal Rule of Appellate Procedure 29(a)(2).

## SUMMARY OF THE ARGUMENT

Kansas City Ordinance §50-234(b) and Jackson County Ordinance §5575.1(a) (the "Ordinances") prohibit licensed therapists from subjecting minors to conversion therapy—attempts to change a minor's sexual orientation or gender identity.  As *Amici*'s extensive research and experience working with LGBTQ youth nationwide confirms, these practices are scientifically discredited, ineffective, and affirmatively harmful to LGBTQ youth.  The Trevor Project's nationwide research and crisis-support data demonstrate that conversion therapy contributes to severe mental-health outcomes, including increased risks of depression,

---

[1] No party or party's counsel authored or contributed money intended to fund preparing or submitting this brief.  No person other than *Amici*, their members, or their counsel contributed money intended to fund preparing or submitting this brief.  Fed. R. App. P. 29(a)(4)(E).

- 2 -

Appellate Case: 25-2566    Page: 13    Date Filed: 02/12/2026 Entry ID: 5607768

anxiety, and suicidal ideation. Conversion therapy also fractures families, estranges children from parents, and erodes public trust in licensed mental-health professionals.

The Ordinances reflect a textbook exercise of traditional state and local police power to protect the health and safety of children and to regulate the professional conduct of licensed medical providers. The City's and County's authority and compelling interests in protecting minors and regulating unsafe medical treatments on youth by setting appropriate standards of care for licensed professionals (not ordinary citizens or religious advisors) are well-settled.

Appellants argue there is an ongoing debate about the efficacy and safety of conversion therapy treatments. But for decades, "[e]very major medical and mental[-]health organization has uniformly rejected aversive and non-aversive conversion therapy as unsafe and inefficacious." *Tingley v. Ferguson*, 47 F.4th 1055, 1078 (9th Cir. 2022), *cert. denied*, 144 S. Ct. 33 (2023). That medical consensus rests on extensive, empirical, evidence-based, and rigorous peer-reviewed studies demonstrating LGBTQ youth subjected to conversion therapy face significantly heightened risk of suicide attempts and other serious harms

- 3 -

Appellate Case: 25-2566     Page: 14     Date Filed: 02/12/2026 Entry ID: 5607768

like depression and anxiety.  Appellants rely on authorities that do not rebut this consensus, and either agree conversion therapy is harmful, are methodologically flawed, or are irrelevant.

Regardless, any scientific debate about the well-documented harms of conversion therapy should be resolved by the democratic process, not courts.  The Supreme Court has repeatedly emphasized that courts should "leave questions regarding [healthcare] policy to the people, their elected representatives, and the democratic process."  *United States v. Skrmetti*, 605 U.S. 495, 525 (2025); *see also Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979) ("The calculus of effects, the manner in which a particular law reverberates in a society, is a legislative and not a judicial responsibility.").  States have "wide discretion to pass legislation in areas where there is medical and scientific uncertainty."  *Skrmetti*, 605 U.S. at 524 (citation modified). That is precisely what happened here.  Following a legislative debate, the City and County joined the legislatures of 22 other states, the District of Columbia, over 100 municipalities, and the executive and administrative actions of 5 additional states and Puerto Rico to prohibit conversion therapy for minors in response to well-documented harms, including

- 4 -

heightened risks of suicide and depression in LGBTQ minors.

The Ordinances represent a constitutionally sound exercise of the state's well-established authority to regulate the conduct of licensed professionals to protect public health and vulnerable minors, under the baseline principle that a treatment "is unsafe if its potential for inflicting death or physical injury is not offset by the possibility of therapeutic benefit." *United States v. Rutherford*, 442 U.S. 544, 556 (1979). Grounded in robust legislative process and consistent with over a century of Supreme Court precedent, the Ordinances target discredited and harmful practices while preserving space for therapeutic dialogue. The Ordinances, as well as Kansas City's Public Accommodation law, are appropriately tailored to advance the compelling interest in protecting children from demonstrable and devastating harm. That the regulated conduct involves speech does not immunize it from reasonable professional regulation. This Court should affirm the district court.

## ARGUMENT

**I. The Trevor Project's Data and Experience Confirm That Conversion Therapy Posing as Professional Care Is Dangerous and Significantly Harms LGBTQ Youth.**

The Trevor Project—the only accredited, free, twenty-four-hour suicide and crisis-intervention lifeline for LGBTQ youth—serves nearly

- 5 -

half a million contacts each year.  LGBTQ youth can call The Trevor Project's nationwide telephone helpline (TrevorLifeline), or use its text-messaging (TrevorText) and online chat (TrevorChat) alternatives, for counseling in times of stress and trouble.[2]  Until July 2025, The Trevor Project was also the lead organization serving the National Suicide Prevention Lifeline ("988") LGBTQ youth specialized services, which responded to approximately 70,000 contacts a month.[3]  It also hosts a social networking site, TrevorSpace, for LGBTQ youth to connect for peer support.[4]  The Trevor Project provides comprehensive training for volunteer counselors or moderators on its platforms.  The Trevor Project collects anonymized data based on its communications with youth, including their conversion therapy-related experiences, which come up as often as weekly.  These impressions are borne out by data collected on TrevorLifeline, TrevorText, and TrevorChat and in the Trevor Project's national surveys on these issues.  Together, its crisis-response data,

---

[2] The Trevor Project, *We're here for you*, bit.ly/4oOAvBr.

[3] Rhitu Chatterjee, *Trump administration ends 988 Lifeline's special service for LGBTQ+ young people,* NPR, (July 19, 2025), https://bit.ly/4r6ypxr.

[4] The Trevor Project, *TrevorSpace*, http://bit.ly/4lHtNuk.

Appellate Case: 25-2566     Page: 17     Date Filed: 02/12/2026 Entry ID: 5607768

national surveys, and peer-reviewed research show conversion therapy poses a serious threat to LGBTQ youth.

**A. The Trevor Project's Crisis and Suicide-Prevention Service Data Reveal the Harmful Impact of Conversion Therapy.**

Many LGBTQ youth who contact The Trevor Project in crisis describe concerns or fears associated with conversion therapy.[5] Since August 2024, youth from 40 states or territories, and more than 100 different cities and towns, raised conversion therapy-related issues in over 650 conversations with The Trevor Project. In 2022, youth from 49 states or territories, and 500+ different cities and towns, raised the issue of conversion therapy in over 1,200 conversations with The Trevor Project. Data tools show youth have used terms like "conversion therapy," "reparative therapy," and "ex-gay" hundreds of times on The Trevor Project's platforms. Transgender and nonbinary youth were twice as likely to mention conversion therapy compared to other youth. Youth who raised conversion therapy with The Trevor Project in 2022 were more than twice as likely to report suicidal ideation than their peers.

---

[5] The information in this section is derived from unpublished, anonymized data The Trevor Project collected and reviewed from its platforms. To protect users' privacy, their identities are not disclosed.

Appellate Case: 25-2566    Page: 18    Date Filed: 02/12/2026 Entry ID: 5607768

The data also shows conversion therapy is a source of deep anxiety. Some LGBTQ individuals contact The Trevor Project afraid because their families are threatening them with conversion therapy, or will force them into conversion therapy if they come out. Some youth report this fear is reinforced by derogatory remarks by family—for instance, that being LGBTQ is "a choice" or "demonic," or that conversion therapy is necessary to "fix" them. Others contact The Trevor Project because they are in conversion therapy, it is harming rather than helping them, and their isolation and failure contribute to suicidal thoughts and behaviors.

Such harm is not limited to the youth undergoing conversion therapy. Conversion therapy profoundly undermines and disrupts family relationships, often causing tension, emotional distance, and separation between parents and children. It often seeks to attribute a supposed "cause" to a patient's gender identity or same-sex attraction, inviting blame and reinforcing harmful misconceptions. Many youth report conversion therapy practitioners told them their identity stems from parental shortcomings or family trauma, harming family relationships.

Some LGBTQ youth who contacted The Trevor Project explained that, after coming out to their parents, their unaccepting family members

Appellate Case: 25-2566   Page: 19   Date Filed: 02/12/2026 Entry ID: 5607768

threatened to sever contact and support unless they agreed to conversion therapy.  Others have been estranged from family who conditioned relationships on consent to conversion therapy.  Some reported that family rejection caused distress and led them to believe that conversion therapy might be their "only" alternative.  LGBTQ youth also regularly reach out to The Trevor Project concerned for loved ones undergoing conversion therapy, and some shared the trauma of losing someone to suicide during or after such treatment.

Accounts collected by The Trevor Project illustrate the pain and trauma conversion therapy can cause:[6]

- "[F]or six months, I sat in a room with a therapist where the goal was to help me see...what the problem was with who I was attracted to and what I wanted in life.... [T]hat was really scarring and very difficult…. I think conversion therapy is dangerous because it takes something inherent in who a person is and tells them…that's wrong and it needs to be fixed…. I didn't choose to be attracted to men. It's just a part of who I am.  And yet I had to sit in a room with someone whose goal was to tell me this is wrong and it needs to be undone.  And they created mental health impact on me."
- "I was in conversion therapy for five years of my early childhood, between the ages of 5-10….  [I]t's been a process for me to…heal, as I move through depression, and rage, and doubt, and denial, and so much confusion.  I'm still healing from that and so much more....

---

[6] This information is derived from information that The Trevor Project collected from volunteers and members of the public for educational purposes.

Appellate Case: 25-2566     Page: 20     Date Filed: 02/12/2026 Entry ID: 5607768

[I]t's a daily struggle.... I've struggled with suicide since I was seven or eight, in the deepest, darkest moments of conversion therapy."

- "[S]o we even developed a fund from our church to send people to conversion therapy, hoping they'll change.  And through the course of time, I realized that people weren't changing…. And in fact, [] we're not only seeing people not change, but people are actually getting worse.  We saw like noticeable increase[s] [in] people's depression and suicidal ideation and people...doing self-harm.... I remember one conversation I had with a friend who confided to me that she was lesbian...she said [], imagine if I told you to look at that man and somehow figure out how to be attracted to him...she [] kind of illustrate[d] for me how impossible the situation was and made me realize, well, we're asking people to do something that is beyond people's capabilities of who they are."[7]

## B. The Trevor Project's National Surveys and Peer-Reviewed Research Reveal Conversion Therapy as a Critical Driver of Elevated Anxiety, Depression, and Suicidality Among LGBTQ Youth.

The Trevor Project conducts annual, quantitative, cross-sectional national surveys of LGBTQ youth with representation from all 50 states and D.C. concerning the mental health of LGBTQ youth.  The content and methodology of these surveys are subject to review and approval by an independent, institutional review board.  The surveys use a quantitative cross-sectional design, and qualified respondents complete a secure online questionnaire with up to 143 questions in English or

---

[7] *See also* The Trevor Project, *Learn With Love: Episode 1*, YouTube (Jan. 31, 2023), http://bit.ly/4mzIn8k.

- 10 -

Appellate Case: 25-2566     Page: 21     Date Filed: 02/12/2026 Entry ID: 5607768

Spanish. Questions on considering and attempting suicide in the previous year are taken from the Centers for Disease Control and Prevention's ("CDC") Youth Risk Behavior Survey to allow comparisons to the CDC's nationally representative sample. Since 2019, each survey has included questions about conversion therapy.

In May 2024, The Trevor Project released the results of its nationwide survey of over 18,500 LGBTQ individuals aged 13-24.[8] Thirteen percent of LGBTQ youth reported being threatened with (8%) or subjected to (5%) conversion therapy, including approximately one in six transgender and nonbinary young people (16%) and nearly one in ten youth who are not transgender or nonbinary (9%).[9] The survey demonstrates that exposure to conversion therapy is a significant risk factor for suicidality. Among those subjected to or threatened with conversion therapy, 27% reported attempting suicide in the prior 12 months.[10] These respondents attempted suicide three times more often

---

[8] The Trevor Project, *2024 U.S. National Survey on the Mental Health of LGBTQ+ Young People* 1, 31 (May 2024), http://bit.ly/45S0b7C [hereinafter "2024 National Survey"].

[9] *Id.* at 17.

[10] *Id.* at 19.

Appellate Case: 25-2566 Page: 22 Date Filed: 02/12/2026 Entry ID: 5607768

than LGBTQ peers not subjected to or threatened with conversion therapy (27% vs. 9%).[11]   These practices often target youth at a vulnerable age, starting as young as 13, if not younger.[12]  The survey also found that among respondents subjected to or threatened with conversion therapy, 56.6% reported considering suicide in the past year, 75.6% experienced recent anxiety, and 65.2% experienced recent depression.[13]

These effects were even more severe for transgender and nonbinary youth subjected to or threatened with conversion therapy.  These youth reported significantly higher rates of anxiety (79.7% vs. 66.1%), depression (68.8% vs. 56.9%), suicidal ideation (61% vs. 45.2%), and suicide attempts (29.2% vs. 21.1%) in the past year compared to peers who are not transgender or nonbinary.[14]

The 2024 Survey's findings reinforce The Trevor Project's research

---

[11] *Id.*

[12] *Id.*

[13] This information is derived from anonymized unpublished data The Trevor Project collected and reviewed as part of its 2024 National Survey.

[14] 2024 National Survey.

Appellate Case: 25-2566     Page: 23     Date Filed: 02/12/2026 Entry ID: 5607768

in prior years. In May 2023, The Trevor Project released the results of a nationwide survey of over 28,000 LGBTQ individuals between ages 13--24.[15] Among respondents subjected to or threatened with conversion therapy, 28% reported attempting suicide in the past year—more than twice the rate of LGBTQ peers not undergoing or being threatened with conversion therapy (11%).[16]

The Trevor Project's nationwide survey released in May 2022 included responses from nearly 34,000 LGBTQ individuals between ages 13-24.[17] Among those subjected to conversion therapy, *28%* reported attempting suicide in the past year.[18] Likewise, among those threatened with conversion therapy, 27% reported attempting suicide in the past year—more than twice the rate of LGBTQ peers not undergoing or being threatened with conversion therapy (11%).[19] The Trevor Project's 2020 and 2021 nationwide surveys of a combined total of nearly 75,000 LGBTQ

---

[15] The Trevor Project, *2023 U.S. National Survey on the Mental Health of LGBTQ Young People* 3 (May 2023), http://bit.ly/41UmkAT.

[16] *Id.* at 20.

[17] The Trevor Project, *2022 National Survey on LGBTQ Youth Mental Health* 3 (May 2022), http://bit.ly/4n0Dyow.

[18] *Id.* at 19.

[19] *Id.*

- 13 -

Appellate Case: 25-2566     Page: 24     Date Filed: 02/12/2026 Entry ID: 5607768

youth reported similar data and conclusions.[20]   As did its 2019 nationwide survey, which reported that 42% of LGBTQ youth who underwent conversion therapy reported attempting suicide in the prior year, more than twice the rate of their LGBTQ peers not subject to conversion therapy (17%).[21]

The Trevor Project also documented the harmful impacts of conversion therapy in a 2020 peer-reviewed article, reporting that LGBTQ youth who underwent conversion therapy were "more than twice as likely to report having attempted suicide" and more than twice as likely to report multiple suicide attempts in the past year compared to those who did not.[22]  Nearly *half* (44%) of the respondents who underwent conversion therapy attempted suicide at least once in the prior year,

---

[20] The Trevor Project, *National Survey on LGBTQ Youth Mental Health 2021* 12, 17 (2021), http://bit.ly/4657JoA; The Trevor Project, *National Survey on LGBTQ Youth Mental Health 2020* 3, 6, 13 (2020), http://bit.ly/4fQ3FvZ.

[21] The Trevor Project, National Survey on LGBTQ Youth Mental Health 1, 3 (June 2019), http://bit.ly/41jbpAD

[22] Amy E. Green et al., *Self-Reported Conversion Efforts and Suicidality Among US LGBTQ Youths and Young Adults, 2018*, 110 Am. J. Pub. Health 1221, 1221–23 (2020).

- 14 -

Appellate Case: 25-2566     Page: 25     Date Filed: 02/12/2026 Entry ID: 5607768

compared to 17% of those not exposed.[23]  That research demonstrated that exposure to conversion therapy is "strongly associated with suicidality outcomes," with severe and disproportionate impacts on LGBTQ minors across multiple racial/ethnic demographics.[24]

The Trevor Project is currently conducting an online, nationwide, longitudinal study following the mental health and lived experiences of 1,689 LGBTQ youth, ages 13-24.[25]  Its methodology is subject to review and approval by an independent, institutional review board.[26]  An interim report from the study analyzing data collected semi-annually from September 2023 to March 2025 shows conversion therapy rose significantly.[27]  LGBTQ youth threatened or subjected to conversion therapy increased from 11% to 22%, and 9% to 15%, respectively.[28]  The report, again, shows conversion therapy is correlated with a higher

---

[23] *Id.* at 1225, Table 2.

[24] *Id.* at 1221, Table 3.

[25] The Trevor Project, *Project SPARK Interim Report: A Longitudinal Study of Protective and Risk Factors in LGBTQ+ Youth Mental Health (2023-2025)* 1 (Oct. 16, 2025), https://bit.ly/49PVRYv.

[26] *Id.* at 5.

[27] *Id.* at 17.

[28] *Id.*

Appellate Case: 25-2566   Page: 26   Date Filed: 02/12/2026 Entry ID: 5607768

likelihood of depression and suicidal ideation.[29]

## C. The Trevor Project's Data is Consistent with Decades of Research on the Harms of Conversion Therapy.

Decades of peer-reviewed, retrospective, and case-controlled studies confirm that conversion therapy inflicts serious harms upon LGBTQ people, especially youth.[30]  Recent data shows: "Around 27 percent of U.S. LGBTQ youth who experienced conversion therapy had attempted suicide within the previous [year] as of 2023, compared to [9%] of LGBTQ youth who had not experienced conversion therapy."[31]  A 2023 study found that transgender adolescents subjected to conversion therapy faced a 55% higher risk of attempting suicide, with the most

---

[29] *Id.* at 37–40.

[30] *See* Amy Przeworski et al., *A systematic review of the efficacy, harmful effects, and ethical issues related to sexual orientation change efforts*, Clinical Psychol.: Sci. & Prac. 1, 1 (2020), http://bit.ly/4mQgKYk; Am. Ass'n of Suicidology, *Suicidal Behavior Among Lesbian, Gay, Bisexual, and Transgender Youth Fact Sheet* 1 (2019), http://bit.ly/47bgv5B ("[Y]outh who have undergone conversion therapy [are] more than twice as likely to attempt suicide as those who did not[.]").

[31] Statista Rsch. Dep't, *U.S. LGBTQ youth who experienced conversion therapy and attempted suicide 2023*, Statista (July 2, 2024), http://bit.ly/4fQZIam.

- 16 -

Appellate Case: 25-2566     Page: 27     Date Filed: 02/12/2026 Entry ID: 5607768

severe effects observed among youth aged 11-14.[32]

Conversion therapy harms LGBTQ youth "by invoking feelings of rejection, guilt, confusion, and shame, which in turn can contribute to decreased self-esteem, substance abuse, social withdrawal, depression, and anxiety."[33]  Accordingly, "[n]o available research supports the claim that" conversion therapy "[is] beneficial to children, adolescents, or families."[34]  A 2023 SAMHSA report explains that conversion therapy is a "dangerous, discredited, and ineffective" practice linked to "significant harms, such as increased risk of suicidality and suicide attempts, as well as... severe psychological distress and depression."[35]  SAMHSA's report notes that, given these risks, "every major medical, psychiatric, psychological, and professional mental health organization has taken measures to end sexual orientation change efforts and gender identity

---

[32] Travis Campbell & Yana van der Meulen Rodgers, *Conversion therapy, suicidality, and running away: An analysis of transgender youth in the U.S.*, 89 J. Health Econ. 1, 2 (2023), http://bit.ly/4oL3Lcl.

[33] AFSP, *Policy Priority: LGBTQ Individuals & Communities* 3-5, 2 (2024), http://bit.ly/4mwG7i0.

[34] Substance Abuse & Mental Health Servs. Admin. ("SAMHSA"), *Moving Beyond Change Efforts: Evidence and Action to Support and Affirm LGBTQI+ Youth* 9 (2023), http://bit.ly/476F5Vj.

[35] *Id.* at 8.

Appellate Case: 25-2566     Page: 28     Date Filed: 02/12/2026 Entry ID: 5607768

change efforts."[36]

Consistent with this, major medical and mental-health organizations uniformly reject conversion therapy as unsafe for minors and without scientific merit.[37] *Amicus* NAMI, the nation's largest grassroots mental-health organization, "supports public policies and laws to ban the discredited, discriminatory, and harmful practice of conversion therapy" because "no one should be subject to practices that can cause or worsen mental health symptoms."[38] The APA, the leading professional organization for psychologists, has opposed conversion therapy for decades.[39] The American Medical Association ("AMA"), the American Psychiatric Association, the American Foundation for Suicide Prevention ("AFSP"), the American Academy of Pediatrics, the American Counseling Association, the American Psychoanalytic Association, the American

---

[36] *Id.* at 30.

[37] AMA, *Sexual orientation and gender identity change efforts (so-called "conversion therapy")* 3 (2022), http://bit.ly/3Vdw6dw.

[38] NAMI, *Conversion Therapy: Where We Stand*, (2020), http://bit.ly/4oOAgX5.

[39] Am. Psychol. Ass'n, *Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation* 4, 6 (2009), http://bit.ly/45HE4AE; Przeworski, *supra* note 30, at 17 (citations omitted).

Appellate Case: 25-2566    Page: 29    Date Filed: 02/12/2026 Entry ID: 5607768

College of Physicians, the American School Counselor Association, the National Association of Social Workers, the American Academy of Nursing, the American Academy of Child and Adolescent Psychiatry, and the American Academy of Family Physicians have all denounced conversion therapy.[40] The consensus is clear: conversion therapy "put[s] individuals at significant risk of harm"[41] and cannot "cure" someone of their sexual orientation, gender identity, or gender expression.[42] Indeed, there is nothing to "cure."[43]

### D. The Trevor Project's Surveys Demonstrate That Fear of Conversion Therapy Prevents Many LGBTQ Youth from Seeking Help.

Access to supportive mental-health professionals is a key concern

---

[40] *See* U.S. Joint Statement, *United States Joint Statement Against Conversion Efforts* (2023), http://bit.ly/45zmTm8; Am. Psychol. Ass'n, *Just the Facts About Sexual Orientation and Youth* 6–9 (2008), http://bit.ly/4fTlIBx; Am. Med. Ass'n, *Health Care Needs of Lesbian, Gay, Bisexual, Transgender and Queer Populations H-160.991* § 1(c), http://bit.ly/4n0l2N1; Am. Acad. of Nursing, *American Academy of Nursing Position Statement on Reparative Therapy*, 63 Nursing Outlook 368, 368–369 (2015), *available at* http://bit.ly/4mvOPNK; AFSP, *Policy Priority: LGBTQ Individuals & Communities* 3–5, 9 (2024), http://bit.ly/4mwG7i0; AFSP, *LGBTQ Individuals & Populations* (2025), http://bit.ly/4mnnGMK. .

[41] *See* U.S. Joint Statement, *supra* n.40.

[42] *See* Am. Psychol. Ass'n, *supra* n.39, at 6–9.

[43] *Id.*

Appellate Case: 25-2566   Page: 30   Date Filed: 02/12/2026 Entry ID: 5607768

for LGBTQ youth experiencing mental-health issues like anxiety, depression, or suicidality. Fear of conversion therapy is one factor preventing LGBTQ youth from accessing critical mental-health services they need. The Ordinances empower the City and County to impose fines on violators. K.C. Ord. §50-234(d); Jackson Cnty. Ord. §5575.3. These deterrent penalties are critical because many LGBTQ youth report avoiding legitimate mental-health care out of fear that conversion therapy may be embedded.

Eighty-four percent of LGBTQ youth surveyed in The Trevor Project's 2024 National Survey indicated a desire for mental-health care.[44] Yet, only 50% of those who wanted such care received it.[45] Over 23% of LGBTQ youth who are not transgender, and 37% of transgender youth who wanted mental-health care but avoided seeking it, identified the fear of being subjected to conversion therapy as a reason for not seeking it.[46] The Trevor Project's 2023 national survey likewise showed that 15% of LGBTQ youth who wanted—but did not receive—mental-

---

[44] 2024 National Survey at 9.

[45] *Id.*

[46] Derived from anonymized internal data The Trevor Project collected, compiled, and reviewed as part of its 2024 National Survey.

- 20 -

Appellate Case: 25-2566      Page: 31      Date Filed: 02/12/2026 Entry ID: 5607768

health care cited fear of conversion therapy as the reason.[47] LGBTQ youth who identified a fear of conversion therapy as a barrier to seeking mental-health care were significantly more likely to have experienced conversion therapy (11%) or been threatened with it (25%).[48] They also reported markedly higher rates of anxiety (83%), depression (73%), suicidal ideation (60%), and suicide attempts (22%) compared to peers without such fears (71%, 59%, 42%, and 12%, respectively).[49] This suggests that LGBTQ youth who need mental-health services are scared to access those services because they are worried about being subjected to conversion therapy. These laws remedy that significant issue.

## II. The City and County Considered and Balanced Competing Positions on Conversion Therapy, and the Court Should Defer to Their Findings.

In enacting the Ordinances, the City Council's Finance, Governance and Public Safety Committee and the County's Diversity Equity and

---

[47] Derived from anonymized internal data that The Trevor Project collected, compiled, and reviewed as part of its 2023 National Survey.

[48] *Id.*

[49] *Id.*

Appellate Case: 25-2566    Page: 32    Date Filed: 02/12/2026 Entry ID: 5607768

Inclusion Committee heard public comments.[50] They heard input from supporters of the Ordinances like LGBTQ residents, parents of LGBTQ youth, and religious leaders; and opponents like the Catholic Diocese of Kansas City-St. Joseph and other religious leaders.[51] Proponents raised findings from numerous medical organizations, including the AMA and the American Psychiatric Association, that conversion therapy is extremely harmful to LGBTQ individuals and youth.[52] Opponents argued that conversion therapy can be effective and helpful to youth.[53]

After considering this information, the City and County each found that "a national community of professionals in education, social work, health, mental health and counseling...have determined that there is no scientifically valid evidence that supports the practice of conversion

---

[50] *See* Allison Kite, *Kansas City bans conversion therapy for LGBTQ minors, the 2nd Missouri city to do so*, Kansas City Star (Nov. 14, 2019), https://bit.ly/4a3zm2e; Public Hearing regarding Ordinance #5711 (Mar. 6, 2023), https://bit.ly/4a76Pc9 ["Kansas City Hearing"].

[51] *See* Kite, *supra* n.50; JacksonCountyMO, *Jackson County Diversity Equity & Inclusion Committee Public Hearing March 16, 2023* (YouTube, Mar. 21, 2023), https://bit.ly/4afpYIQ ["Jackson County Hearing"].

[52] *See* Kite, *supra* n.50; Jackson County Hearing.

[53] *See* Kite, *supra* n.50; Jackson County Hearing.

Appellate Case: 25-2566    Page: 33    Date Filed: 02/12/2026 Entry ID: 5607768

therapy," and that "conversion therapy is not only ineffective, but is substantially dangerous to an individual's mental and physical well-being and has also been shown to contribute to depression, self-harm, low self-esteem, family rejection, and suicide." K.C. Ord. §50-234; Jackson Cnty. Ord. §5575.1; Appellees' Br. 23. Given the overwhelming evidence and the "responsibility to protect the health, safety, and welfare of all people in [the] community, especially the physical and psychological well-being of minors, including LGBTQ youth," the legislatures appropriately concluded that all minors in Kansas City and Jackson County "should be free from exposure to the serious harms and risks caused by conversion therapy." K.C. Ord. §50-234; Jackson Cnty. Ord. §5575.1. For these reasons, "the City Council found that conversion therapy...is a discredited therapy without scientifically valid evidence to support it, and which has been found...to be both ineffective and 'substantially dangerous.'" *Wyatt Bury, LLC v. City of Kansas City*, 804 F. Supp. 3d 939, 952 (W.D. Mo. 2025).

Such legislation is entitled to "a strong presumption of validity." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993), and "the [judiciary] leaves wide discretion for medical legislation to the more

- 23 -

Appellate Case: 25-2566     Page: 34     Date Filed: 02/12/2026 Entry ID: 5607768

politically accountable bodies, especially in areas of medical uncertainty." *Brandt v. Griffin*, 147 F.4th 867, 884 (8th Cir. 2025); *see also Gonzales v. Carhart*, 550 U.S. 124, 163 (2007) (similar). Legislatures are "far better equipped than the judiciary to amass and evaluate the vast amounts of data bearing upon legislative questions." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (citation modified).

The Supreme Court recently confirmed the importance of "leav[ing] questions regarding" "scientific and policy debates" "to the people, their elected representatives, and the democratic process." *Skrmetti*, 605 U.S. at 525; *see also id.* at 547 (Thomas, J., concurring) ("The Court...reserves to the people, their elected representatives, and the democratic process the power to decide how best to address an area of medical uncertainty and extraordinary importance") (citation modified). This Court should "decline[] the plaintiff's invitation to second-guess the lines that [the Ordinances] draw[]." *Id.* at 498; *see also id.* at 532 (Thomas, J., concurring) ("It is imperative that courts treat state legislation with 'a strong presumption of validity,' and in turn protect States' ability to enact 'high-stakes medical policies...'") (citation modified); *id.* at 552 (Barrett, J., concurring) ("The question of how to regulate a medical condition such

- 24 -

Appellate Case: 25-2566     Page: 35     Date Filed: 02/12/2026 Entry ID: 5607768

as gender dysphoria involves a host of policy judgments that legislatures, not courts, are best equipped to make.").

Once a legislature has duly considered a full range of relevant facts and perspectives, it retains the authority to adopt the policy approach it deems appropriate. *See id*. at 522-23. The "fact the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration." *Id*. at 524 (citation omitted). This Court should reject Appellants' request to override the outcome of the democratic process that resolved how best to protect the health of young people.

Nevertheless, Appellants attempt to rebut the well-established harms of conversion therapy by citing sources that are fatally flawed or confirm that conversion therapy is harmful to youth. These sources fail to rebut the validity of data on which the legislatures relied and do not provide a basis for the Court to substitute its judgment for the legislatures'.

First, Appellants rely on an article by D. Paul Sullins to dispute the well-established link between conversion therapy and increased

- 25 -

Appellate Case: 25-2566     Page: 36     Date Filed: 02/12/2026 Entry ID: 5607768

suicidality.[54]  But, as other experts have detailed, the Sullins study suffered from serious methodological flaws.  Sullins incorrectly relied on data that did not "indicate the age when a person was first exposed to [conversion therapy]," making it impossible to determine whether "suicide morbidity before or after exposure to [conversion therapy]" changed.[55]  Similarly, Sullins "misrepresented findings on [the] time of [conversion therapy] exposure," claiming it "usually last[s] less than a year," when data shows "most people who were exposed to [conversion therapy] had multiple and prolonged exposures."[56]  He also only assessed the suicide morbidity of individuals who experienced conversion therapy in the previous *year*, even though most survivors "experience [it] at a young age," and as such "suicide morbidity, if it occurred, would have been more proximal to the initial [] exposure."[57]  The result artificially

---

[54] Appellants' Br. 20 (citing D. Paul Sullins, *Sexual Orientation Change Efforts Do Not Increase Suicide: Correcting a False Research Narrative*, 51 Archives of Sexual Behavior 3377 (Sept. 2022)).

[55] Ilan H. Meyer & John R. Blosnich, *Commentary: Absence of Behavioral Harm Following Non-Efficacious Sexual Orientation Change Efforts: A Retrospective Study of United States Sexual Minority Adults, 2016– 2018*, 13 Frontiers in Psych. 997513, at 2 (2022).

[56] *Id.*

[57] *Id.*

Appellate Case: 25-2566     Page: 37     Date Filed: 02/12/2026 Entry ID: 5607768

constrained the number of suicide attempts in the data set.[58] Finally, Sullins' article relies on two of his own articles; both have been criticized by peers and one was "retracted" because "two independent external reviews...concluded that the methodology, and subsequent statistical analysis, employed by the study cannot support the conclusions around efficacy and effectiveness."[59]

Second, Appellants identify research showing that sexuality is not immutable.[60] That some people experience changes to the understanding of their sexuality over time does not suggest conversion therapy is effective. That same source explains conversion therapy is "not only

---

[58] *Id.*; *see also* John R. Blosnich et al., *Correcting a False Research Narrative: A Commentary on Sullins*, 52 Archives of Sexual Behavior 885, 885–87 (2023) (Sullins' "analyses are predicated on a fabricated classification of temporal order" and are thus "invalid.").

[59] D. Paul Sullins, *Absence of behavioral harm following non-efficacious sexual orientation change efforts: A retrospective study of United States sexual minority adults, 2016–2018*, Frontiers in Psych. 13, 823647 (2022), http://bit.ly/3Jsmn0w (criticized by Meyer and Blosnich, *supra* note 55); D. Paul Sullins et al., *Efficacy and risk of sexual orientation change efforts: A retrospective analysis of 125 exposed men*, F1000Research, 10:222 (2021), http://bit.ly/4p73D7h.

[60] Appellants' Br. 20 (citing Lisa M. Diamond & Clifford J. Rosky, *Scrutinizing Immutability: Research on Sexual Orientation & U.S. Legal Advocacy for Sexual Minorities*, 53 J. Sex Research 363, 364 (2016)).

Appellate Case: 25-2566     Page: 38     Date Filed: 02/12/2026 Entry ID: 5607768

ineffective in changing sexual orientation but [is] psychologically damaging, often resulting in elevated rates of depression, anxiety, and suicidality."[61]

Third, the Cass Review, commissioned by England's National Health Service ("NHS")—which Appellants cite for claims about the efficacy of *medical intervention*, a subject entirely outside the purview of the Ordinances—also states that "no LGBTQ+ group should be subjected to conversion practice."[62]  Indeed, the Cass Review explains that "[n]o formal science-based training in psychotherapy, psychology or psychiatry teaches or advocates conversion therapy," and that "[i]f an individual were to carry out such practices they would be acting outside of professional guidance, and this would be a matter for the relevant regulator."[63]

---

[61] Diamond & Rosky, *supra* note 60, at 373.

[62] Appellants' Br. 21 (citing Hilary Cass, *Independent Review of Gender Identity Services for Children and Young People*, NHS 150 (Apr. 2024), http://bit.ly/3HMyrZR).

[63] *Id.* at 151; *see also* Chris Noone et al., *Critically Appraising the Cass Report: Methodological Flaws and Unsupported Claims*, BMC Medical Research Methodology 25:128 (2025) (finding "several instances of insufficiently evidenced claims being used to inform its recommendations" and "observ[ing] serious methodological deficiencies" with the Cass Review's research).

Appellate Case: 25-2566     Page: 39     Date Filed: 02/12/2026 Entry ID: 5607768

The legislatures considered views on both sides, including the topics in the sources relied upon by Appellants, and concluded the weight of credible evidence supported regulatory action to protect LGBTQ youth.

### III. The Ordinances Fall Squarely Within a Local Government's Traditional Authority to Protect Minors by Regulating Medical Treatments and Standards of Care for Licensed Professionals.

These Ordinances protect minors from practices the legislatures determined are dangerous, discredited, and ineffective.

Under Eighth Circuit and Supreme Court precedent, local and state governments have the power to enact reasonable legislation regulating the professional conduct of medical and other licensed professionals, and to prevent malpractice by establishing reasonable regulatory standards for the provision of medical treatments. *See, e.g.*, *Lambert v. Yellowley*, 272 U.S. 581, 596 (1926) (there is "no right to practice medicine which is not subordinate to the police power of the states"); *Collins v. Texas*, 223 U.S. 288, 297-98 (1912) (recognizing the "right of the [S]tate to adopt a policy even upon medical matters concerning which there is difference of opinion and dispute"); *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975) (states have a compelling interest in regulating professions to "protect the public health, safety, and other valid interests," including by

- 29 -

Appellate Case: 25-2566    Page: 40    Date Filed: 02/12/2026 Entry ID: 5607768

"establish[ing] standards for licensing practitioners and regulating the practice of professions"); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460, 464 (1978) (similar); *Skrmetti*, 606 U.S. at 540 (Thomas, J., concurring) ("States have a legitimate interest in protecting the integrity and ethics of the medical profession.") (citation modified); *Lehon v. Atlanta*, 242 U.S. 53, 55 (1916) (state and local governments have the power to regulate businesses and provide "the stamp of the State as to fitness and character"). Such an exercise of police power is presumed constitutionally valid. *Bibb v. Navajo Freight Lines*, 359 U.S. 520, 529 (1959).

The City and County have done exactly that: exercised their legislative authority to pass a limited regulation on licensed medical professionals in a clinical context. The Ordinances are reasonable and limited in scope. They appropriately prohibit therapeutic practices only by licensed professionals—not ordinary citizens or religious advisors.

Appellants have not demonstrated, as they must, that the law is not in "the interests of the public" and that "the means are [not] reasonably necessary for the accomplishment of the purpose, and [are] unduly oppressive upon individuals." *Goldblatt v. Hempstead*, 369 U.S.

- 30 -

Appellate Case: 25-2566    Page: 41    Date Filed: 02/12/2026   Entry ID: 5607768

590, 594 (1962) (citation omitted); *id.* at 596; *see also Reinman v. Little Rock*, 237 U.S. 171, 175 (1915).

First, the Ordinances protect youth from the significant harms of conversion therapy which advances "the protection of the public safety, health, and morals...[and] the promotion of the common convenience, prosperity, and welfare." *Marrs v. Oxford*, 32 F.2d 134, 139 (8th Cir. 1929) (citation omitted).

Second, the Ordinances pursue a reasonable plan "relat[ed] to the health, morals, safety, and general welfare of the community." *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395 (1926). The stated goal—protecting LGBTQ youth from a harmful practice—is related to the means the legislation uses to achieve that goal. *Thomas Cusak Co. v. Chicago*, 242 U.S. 526, 529 (1917); *supra* Section II; K.C. Ord. §50-234(a); preamble, Jackson Cnty. Ord. No. 5371 (Apr. 3, 2023). While courts permit broadly inclusive regulations, *Euclid*, 272 U.S. at 387-89, the Ordinances narrowly define conversion therapy as that which "seeks to change an individual's sexual orientation or gender identity," limit the prohibition only to conversion therapy on minors, and apply it only to "licensed medical or mental health professionals." K.C. Ord. §§50-234(b)(1)-(4);

- 31 -

Appellate Case: 25-2566    Page: 42    Date Filed: 02/12/2026 Entry ID: 5607768

Jackson Cnty. Ord. 5575.1(a), (d), 5575.2.

Third, the ordinances are not unduly oppressive. *Hadacheck v. Sebastian*, 239 U.S. 394, 394 (1915). The legislatures' careful tailoring of the Ordinances to reflect relevant legal distinctions, limiting the Ordinances to conversion therapy exercised by licensed professionals towards minors, ensures that they target only professional conduct within a clinical relationship—where professional, ethical, and legal duties to patients apply—rather than the general public, who bear no such obligations and are not subject to licensing and regulation. Indeed, there is no common right for licensed practitioners to engage in professional practice without regulation or to harm patients. *Brandt*, 147 F.4th at 888.

That Appellants characterize their conduct as "speech" does not immunize it from regulation. The First Amendment does not prevent "mak[ing] a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Ohralik*, 436 U.S. at 456 (citation modified). Just because "psychoanalysts employ speech to treat their clients does not entitle them, or their profession, to special First Amendment

- 32 -

Appellate Case: 25-2566     Page: 43     Date Filed: 02/12/2026 Entry ID: 5607768

protection." *National Ass'n for Advancement of Psychoanalysis v. Cal. Bd. of Psychology*, 228 F.3d 1043, 1054 (9th Cir. 2000) (citation modified) ["*NAAP*"], *cert. denied*, 532 U.S. 972 (2001). The Supreme Court has upheld narrow regulations on licensed professionals, including when speech is part of their conduct. *National Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 769 (2018) ("professionals are no exception to t[he] rule" permitting "restrictions directed at commerce or conduct" under the First Amendment); *Ohralik*, 436 U.S. at 449, 457-59 (upholding state bar disciplinary rules that "limited the communication of two kinds of information"); *Fla. Bar v. Went for It Inc.*, 515 U.S. 618, 632-33 (1995) (similar); *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 246 (2010) (upholding statute restricting debt relief professionals from giving certain advice); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 771-72 (1976) (First Amendment "does not prohibit the State from insuring that the stream of commercial information flow cleanly as well as freely").

The legislatures were well within their power to regulate this harmful treatment performed by licensed professionals. Cities and states have a "substantial interest in the well-being of its youth." *Upper*

- 33 -

Appellate Case: 25-2566     Page: 44     Date Filed: 02/12/2026 Entry ID: 5607768

*Midwest Booksellers Ass'n v. Minneapolis*, 780 F.2d 1389, 1396-97 (8th Cir. 1985); *see also New York v. Ferber*, 458 U.S. 747, 756-57 (1982) (a state's "interest in safeguarding the physical and psychological well-being of a minor is compelling") (cleaned up); *Osborne v. Ohio*, 495 U.S. 103, 109 (1990) (similar); *Ginsberg v. New York*, 390 U.S. 629, 640-41 (1968) ("[T]he State has an interest to protect the welfare of children and to see that they are safeguarded from abuses….") (citation modified). "Psychotherapy" is part of "the medical profession," *Powell v. Texas*, 392 U.S. 514, 527-28 (1968), and the "interest in regulating mental health is even more compelling than a state's interest in regulating in-person solicitation by attorneys." *NAAP*, 228 F.3d at 1054. As such, the legislatures exercised their power to achieve substantial interests in protecting minors from the harms of conversion therapy. Likewise, Kansas City's Public Accommodations law appropriately protects vulnerable youth from discrimination when seeking mental health care they need, consistent with the First Amendment. *See Masterpiece Cakeshop v. Colo. Civil Rights Comm'n*, 584 U.S. 617, 631 (2018); Appellees' Br. 17-19.

Appellate Case: 25-2566    Page: 45    Date Filed: 02/12/2026 Entry ID: 5607768

# CONCLUSION

This Court should affirm the district court's decision.

Dated: February 11, 2026

Julia Doody
GIBSON, DUNN & CRUTCHER LLP
1900 Lawrence St., Suite 300
Denver, CO 80202
(303) 298-5710
jdoody@gibsondunn.com

Erica Robison
GIBSON, DUNN & CRUTCHER LLP
310 University Avenue
Palo Alto, CA 94301
(650) 849-5364
erobison@gibsondunn.com

Quinn Ferrar
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center #2600
San Francisco, CA 94111
(415) 393-8286
qferrar@gibsondunn.com

Respectfully submitted,
  /s/ *Abbey Hudson*

Abbey Hudson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000
ahudson@gibsondunn.com

Kelly Herbert
Apratim Vidyarthi
Cate Nash
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000
kherbert@gibsondunn.com
avidyarthi@gibsondunn.com
cnash@gibsondunn.com

Alexander Fischer
GIBSON, DUNN & CRUTCHER LLP
811 Main St., Ste. 3000
Houston, TX 77002
(346) 718-6740
afischer@gibsondunn.com

*Attorneys for Amici Curiae The Trevor Project, Inc. and the National Alliance for Mental Illness*

Appellate Case: 25-2566    Page: 46    Date Filed: 02/12/2026 Entry ID: 5607768

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I certify that this brief complies with the applicable typeface, type style, and type-volume limitations. This brief complies with Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it was prepared using a proportionally spaced type (New Century Schoolbook, 14 point). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f) and Sixth Circuit Rule 32(b), this brief contains 6,486 words. This certificate was prepared in reliance on the word-count function of the Microsoft Word for Microsoft 365 software used to prepare this brief. The undersigned certifies under Eighth Circuit Rule 28A(h)(2) that the brief has been scanned for computer viruses and that the brief is virus free.

February 11, 2026

Respectfully submitted,

*/s/ Abbey Hudson*
Abbey Hudson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000
ahudson@gibsondunn.com

- 36 -

Appellate Case: 25-2566    Page: 47    Date Filed: 02/12/2026 Entry ID: 5607768

## CERTIFICATE OF SERVICE

I hereby certify that, on February 11th, 2026, I electronically filed the foregoing brief with the Clerk for the United States Court of Appeals for the Eighth Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

February 11, 2026

Respectfully submitted,

/s/ *Abbey Hudson*

Abbey Hudson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000
ahudson@gibsondunn.com

- 37 -

Appellate Case: 25-2566    Page: 48    Date Filed: 02/12/2026 Entry ID: 5607768